Jeffrey R. Oritt (2478)
Cohne|Kinghorn
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
Phone: (801) 363-4300
joritt@cohnekinghorn.com

Craig K. Vernon (ISB No. 5514)
*Pro Hac Vice Admission Pending*
James, Vernon & Weeks, P.A.
1626 Lincoln Way
Coeur d'Alene, ID 83814
Phone: (208) 667-0683
cvernon@jvwlaw.net

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MCKENNA DENSON,<br><br>Plaintiff,<br><br>vs.<br><br>THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation; and JOSEPH L. BISHOP,<br><br>Defendants. | **COMPLAINT AND REQUEST FOR JURY TRIAL**<br><br>Case No.<br><br>Judge: |

COMES NOW the Plaintiff, MCKENNA DENSON, and through her undersigned counsel brings this Complaint against Defendants THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation, and JOSEPH L.

BISHOP, based upon information and belief available at the time of the filing.

## I. PARTIES, JURISDICTION AND VENUE

1. Plaintiff, MCKENNA DENSON (hereinafter "DENSON"), is a citizen of the State of Colorado, residing in Pueblo, Colorado.

2. Defendant CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS is a corporation duly organized and operating pursuant to the laws of Utah (hereinafter "COP"). Defendant COP is the corporate organization that functionally operates and advertises itself to the public as The Church of Jesus Christ of Latter-Day Saints (hereinafter "the Church"). The Church is also known as the LDS Church or the Mormon Church. Defendant COP operates church meetinghouses within the State of Utah and also operates a Missionary Training Center ("MTC") in Provo, Utah. Its principal place of business is 50 E. North Temple, Floor 20, Salt Lake City, UT, 84150.

3. Upon information and belief, Defendant JOSEPH L. BISHOP (hereinafter "BISHOP") is currently a citizen of the State of Arizona and a lifelong member of the Church. At various times in his life, BISHOP was elevated by the Church to positions of power and control over thousands of young LDS missionaries. The Church assigned or "called" BISHOP to several high-level leadership positions, including President of the Buenos Aires North LDS Mission in Argentina from approximately 1978 to 1981, and President of the MTC in Provo, Utah, from approximately 1983 to 1986.

4. Plaintiff brings her Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00.

5. Venue is proper in this Court pursuant to 28 USC § 1391(b)(2) or (3).

## II. FACTUAL ALLEGATIONS

6. Defendant COP and The Church are headquartered in Salt Lake City, Utah and claim a membership of over sixteen million members worldwide.

7. The Church is led by a Prophet or President of the Church, and apostles, who are also regarded as prophets, seers, and revelators. The man who has been an apostle for the longest is named as the Prophet and President of the Church, and he selects two other apostles as counselors. These three men function as the First Presidency, which is the governing body of the Church.[1] The First Presidency is responsible for setting the direction of the Church and "counsel[ing] together and with other general Church leaders on matters affecting the worldwide Church, such as missionary work, temple building, spiritual and temporal welfare, and much more."[2]

8. Directly underneath the First Presidency in the power hierarchy of the Church is the Quorum of the Twelve Apostles, who "are special witnesses of Jesus Christ, called to teach and testify of Him throughout the world."[3] These twelve men help set the direction of the Church in all matters, including missionary work, temple building, welfare, and the like.

9. Underneath the Quorum of the Twelve Apostles is the Presidency of the Seventy, consisting of various Quorums of the Seventy. These men "serve in the Presidency of the Seventy, in Area Presidencies, and in other headquarters' administrative functions. Under the direction of the Quorum of the Twelve Apostles, they travel frequently to meet with and teach Church leaders, missionaries, and members of the Church in local congregations."[4]

---

[1] *First Presidency*, THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, https://www.lds.org/church/leaders/first-presidency?lang=eng (last visited Mar. 14, 2018).
[2] *Id.*
[3] *Quorum of the Twelve Apostles*, THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, https://www.lds.org/church/leaders/quorum-of-the-twelve-apostles?lang=eng (last visited Mar. 14, 2018).
[4] *Quorums of the Seventy*, THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, https://www.lds.org/church/leaders/quorums-of-the-seventy?lang=eng (last visited Mar. 14, 2018).

10. The men who preside in the Quorum of the Twelve Apostles, and the Quorums of the Seventy, are among a few select men that are considered "General Authorities." A general authority is a member of the highest level of leadership in the Church, with administrative and ecclesiastical authority that can not only extend to the local and regional levels, but worldwide.

11. A key tenant of the Mormon faith is sharing the beliefs of the Church through religious missions. In 1984, the standard missionary age was 19 years old for young men and 21 years old for young women. Members of the Church, like DENSON was in 1984, are taught that a missionary who is "called to a particular mission is called by revelation through the Lord's servants, the prophets."[5]

12. At the beginning of their service, LDS missionaries are placed at the MTC where they receive training in doctrine, conduct, proselytizing methods, and, when required, a new language. DENSON was placed for training in the MTC at Provo, Utah. This currently consists of a 19-building complex on 39 acres, with the capacity to house and train 3,700 missionaries at a time.

13. The Church calls one man to be the President of the Missionary Training Center, typically for a three-year term. This is a high-level official position. As such, the President of the Church, or a member of the First Presidency, issues this important assignment or calling.

14. In 1983, Defendant JOSEPH L. BISHOP was called to be the President of the Mission Training Center by Gordon B. Hinckley, who at the time was serving as Second Counselor in the First Presidency and would become the President of the Church in 1995. BISHOP accepted the position and served as President of the MTC in Provo, Utah from 1983 to 1986.

15. Defendant BISHOP had served in many official leadership roles with the Church

---

[5] https://www.lds.org/callings/missionary/faqs?lang=eng#3

prior to his calling to be President of the MTC. As a young man he served a two-year mission for the Church in Argentina. When his mission concluded, he served as a member of the bishopric in his local ward in Florida. In approximately 1978, Spencer W. Kimball, who at that time was the Prophet and President of the Church, called BISHOP to be the President of the Buenos Aires North Mission in Argentina and Welfare Agent of Central America. BISHOP served in that capacity until approximately 1982.

16. Defendant BISHOP is a self-proclaimed sexual predator and sexual addict.[6] He admits having been a sexual predator and sexual addict his entire adult life and further admits to engaging in a pattern of inappropriate sexual conduct toward woman throughout his life and prior to being called by President Hinckley to be the MTC President. This includes red flag sexual improprieties with a young woman while serving as a missionary in Argentina. It also includes similar red flag sexual improprieties while serving in a bishopric in Florida. BISHOP admits to disclosing some details of inappropriate sexual actions toward women to his mission president and to his church leaders in Florida.

17. Before ever serving as a mission president, BISHOP was the President at Weber State University. While in that position there were public claims, known to Church leaders, of BISHOP acting inappropriately toward women and allegations of dishonesty and lack of integrity.

18. Despite these previous disclosures to official Church leaders, BISHOP was called as President of the Buenos Aires North Mission in Argentina in approximately 1978, where he was placed in charge of hundreds of young missionaries, male and female. The General Authority and highest-ranking church official in charge of the Church's activities in this area at that time was

---

[6] Bishop admits in a December 2017 recording that has become public to being a lifelong sexual predator and having a sexual addiction. Throughout this interview, Bishop discloses several instances with women, ranging from inappropriate behavior to full-on sexual assault and/or molestation.

Elder Robert E. Wells.

19. Elder Robert E. Wells is currently an emeritus General Authority of the Church. He was sustained as a General Authority and member of the First Quorum of the Seventy in October 1976. Beginning in 1977, and at all times relative hereto, Elder Wells served as the Church's area representative for Chile, Argentina, Paraguay and Uruguay. In this role, he was responsible for the activities of the area missions and their leaders, including BISHOP.

20. During his tenure as Mission President in Argentina, BISHOP counseled one of his sister missionaries who was "besieged with evil spirits." According to BISHOP, those evil spirits then attacked him. Frightened, and in an effort to "save his soul," he decided to confess or disclose all of his previous sins. BISHOP met with Elder Wells and disclosed to Elder Wells every indiscretion, sin, or other misdeed that had occurred up to that point in his life, including his sexual addiction and previous instances of sexual predation against women. Elder Wells gave BISHOP a blessing. BISHOP believes he was forgiven after fully confessing all his past red flag sexual improprieties to Elder Wells. As evidence of this, BISHOP claims that the baptisms in the Argentina mission, over which he presided, went from 70 to over 400 per month, following this disclosure.

21. Following this disclosure to Elder Wells, there is no indication that the Church took any action to investigate these possible crimes or investigate whether, under its own internal policies, BISHOP would be subject to Church discipline. Any of these actions could have alerted DENSON and other vulnerable women to BISHOP'S dangerous propensities.

22. In an epic institutional betrayal of trust, just the opposite occurred; BISHOP was called to be the President of the MTC in Provo, Utah. There, instead of having access to hundreds of young missionaries, the Church elevated him to a position of power over thousands of young

women who were training to be missionaries.

23. Plaintiff MCKENNA DENSON was one of these women. DENSON, a firm believer in the teachings of the Church, had suffered a traumatic and challenging adolescence, including physical and sexual abuse. She had a baby out of wedlock that she gave up for adoption through LDS Social Services. She attempted to find peace and refuge in the Church's teachings.

24. Plaintiff DENSON desired to serve a mission and did receive special permission (required since she had a child out of wedlock) from leaders of the Church to do so. In January of 1984, DENSON entered the Missionary Training Center in Provo, Utah to receive training for her upcoming mission. She had been assigned or "called" by the Prophet of the Mormon Church to serve her mission in Cali, Columbia.

25. From the first day DENSON arrived at the Missionary Training Center, she was singled out by BISHOP, who was then serving as President of the MTC. Out of thousands of missionaries receiving training at the time, DENSON was asked by BISHOP to bear her testimony in front of all other missionaries that entered the MTC on the day she entered. The following meetings she was asked by BISHOP to offer the prayer.

26. On multiple occasions over the next few weeks, DENSON was called out of class to go to BISHOP'S office, where she met with him and other sister missionaries who had similar traumatic backgrounds. In these meetings, BISHOP would ask DENSON and the other sister missionaries specific questions about their childhoods and their families' activities in the Church. Each woman spoke of her childhood trauma and how they had each endured sexual abuse.

27. On other occasions, BISHOP called DENSON to his office with only one other sister missionary present.

28. After several of these meetings, BISHOP began calling DENSON to his office

alone. During their one-on-one meetings, BISHOP would discuss previous sexual encounters he had with his wife and other women.

29. These sexual grooming incidents escalated over time, culminating with BISHOP asking DENSON to go with him to a special room in the basement where he did his "preparations." He escorted her out of his office, down a hallway and through a locked door which led to another hallway or tunnel that was dark and dusty. This hallway or tunnel led to what DENSON describes as a type of storage room. BISHOP unlocked the door to the storage room, escorted DENSON inside, turned on the light and closed the door. The room had no windows, but was furnished with a small bed, a TV, and a VHS player sitting on small table or stand. There was also a metal chair in the room.

30. Once inside this room, BISHOP led DENSON to the bed and they chatted generally for a short time, with BISHOP stating how he preferred this room as a quiet place. Then, BISHOP attempted to kiss DENSON, who pushed him away and got up to leave.

31. Instead of allowing her to leave, BISHOP got in front of DENSON, physically blocking her from the door. He then pushed her back on the bed, grabbed her blouse and tore it open. BISHOP then pulled DENSON'S skirt up, tearing the seam in the back. He pulled her pantyhose and garments down. He exposed himself and briefly penetrated her with his semi-erect penis. During this time, DENSON attempted to push him off, kicking and hitting him. He forced her back down, restraining her with his palms on her shoulders. Eventually, she was able to kick free and pull her garments and hose up enough to get out the door. As DENSON was leaving the room, BISHOP shouted that no one would believe her, saying "Look at you, look at me."

32. In approximately 1987 or early 1988, DENSON revealed the details of this sexual assault, including BISHOP'S identity as the sexual assaulter, to her local bishop. It is believed

that this local bishop reported the incident to the local Stake President, whom it is believed reported the incident to church headquarters in Salt Lake City. Shortly thereafter, Elder Carlos Asay, a member of the First Quorum of the Seventy at the time, interviewed DENSON and told her he would investigate the incident and let her know of the outcome.

### III. FIRST CAUSE OF ACTION: SEXUAL ASSAULT AND BATTERY

33. Plaintiff MCKENNA DENSON incorporates all paragraphs of this Complaint as if fully set forth herein.

34. In early 1984, DENSON was raped and sexually assaulted, while a sister missionary, in a secluded room, unknown to the public at large, at Defendant COP's Missionary Training Center in Provo, Utah.

35. The rape and sexual assault was committed by Defendant JOSEPH L. BISHOP, who at all relevant times was in the course and scope of acting as a servant and/or agent of Defendant COP, making Defendant COP vicariously liable for the injuries caused by BISHOP under the doctrine of respondeat superior.

36. Upon information and belief, prior to the rape and sexual assault alleged above, Defendant COP knew, had reason to know, or was otherwise on notice of prior sexual improprieties against women committed by Defendant BISHOP. Defendant COP failed to take reasonable steps and failed to implement reasonable safeguards to avoid acts of unlawful sexual assault in the future by BISHOP. These failures by Defendant COP included, but are not limited to, placing BISHOP in a position of power over young, vulnerable women, trained to strictly trust and obey BISHOP, the President at the MTC; placing DENSON and other women in a location where they knew or should have known that they would be at an increased risk of being sexually assaulted by a self-proclaimed sexual predator.

37. At no time during the periods of time alleged, did Defendant COP have in place a system or procedure to supervise and/or monitor a leader such as Defendant BISHOP to ensure that he did not sexually assault women. Indeed, while it was the policy for "sister missionaries" to stay with a companion at all times, this requirement was excepted so that sister missionaries could meet one-on-one with BISHOP, a sexual predator, whom Defendant COP elevated to a position of power over DENSON and other sister missionaries.

38. Defendant COP aided the rape and sexual assault of DENSON by failing to take appropriate action to prevent further sexual assaults by BISHOP despite having actual or constructive notice that BISHOP was assaulting women after BISHOP disclosed his sexual predilections and past red flag sexual improprieties toward women to Elder Wells. Defendant COP is directly liable for BISHOP'S assault and battery, or as an accessory.

39. Upon information and belief, after learning that DENSON was raped and sexually assaulted at the MTC, Defendant COP, by and through its agents, ratified the wrongful conduct described herein by failing to report it to law enforcement authorities, prospective LDS members, current LDS members, their families, victims, and the public.

40. As a result of the above-described conduct, DENSON has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## IV. SECOND CAUSE OF ACTION: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

41. Plaintiff MCKENNA DENSON incorporates all paragraphs of this Complaint as if fully set forth herein.

42. Since approximately 1987, when DENSON disclosed the sexual assault to General Authority Carlos Asay, Defendants, by their actions and inactions that followed, caused DENSON emotional distress. This emotional distress has been ongoing. It has been triggered, or caused again, on each and every occasion throughout the years to the present when DENSON disclosed the sexual assault to a Church leader and the Church's action or inaction that followed.

43. In approximately December of 2017, DENSON again, as she had done approximately ten times in the past, disclosed the sexual assault to church leaders. Each time DENSON disclosed the sexual assault, she requested the Church investigate the sexual assault and follow its own internal policies to discipline BISHOP for committing the sexual assault. Each time, the Church took no action toward BISHOP.

44. By taking no action against BISHOP from 1987 to the present, the Church has protected this self-proclaimed sexual predator, while re-victimizing DENSON again and again.

45. From 1987 to December of 2017, church leaders, on each occasion, caused ongoing and aggravated emotional distress by not believing, or discounting, DENSON and by not investigating her allegations. Moreover, in an apparent effort to protect the Church and the self-proclaimed sexual predator, leaders engaged in an ongoing pattern of not only failing to believe DENSON, but even more disturbing, blaming and shaming DENSON.

46. Defendants were negligent in their actions, blame and shame practices, courses of conduct, and omissions as described hereinabove.

47. Defendants knew or should have known that emotional distress, with physical

manifestations, was the likely or foreseeable result of their actions, blame and shame practices, courses of conduct, and omissions as described hereinabove.

48. The actions, blame and shame practices, courses of conduct, and omissions of Defendants, were a direct and proximate cause of the DENSON'S severe emotional distress, with physical manifestations.

49. The emotional distress sustained by the DENSON was of such nature that a reasonable person in her situation would have likely suffered similar emotional distress, with physical manifestations, under the circumstances.

50. As a result of the above-described conduct, DENSON has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## V. THIRD CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

51. Plaintiff MCKENNA DENSON incorporates all paragraphs of this Complaint as if fully set forth herein.

52. The conduct of the Defendants as described above was extreme, intolerable, and outrageous, exceeding all bounds usually tolerated by decent society.

53. This conduct as described above was of the kind designed to cause severe emotional distress.

54. This conduct was a proximate cause of severe emotional distress to DENSON and this conduct was inflicted intentionally and/or with reckless disregard of the probability of causing such distress.

55. As a result of the above-described conduct, DENSON has suffered, and continues to suffer, great pain of mind and body, shock, severe and extreme emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## VI. FOURTH CAUSE OF ACTION: COMMON LAW FRAUD

56. Plaintiff MCKENNA DENSON incorporates all paragraphs of this Complaint as if fully set forth herein.

57. Defendants committed common law fraud by making false statements or false representations about an important fact, knowing of its falsity and with disregard for the truth, with knowledge that DENSON and other missionaries would rely on these statements or representations. DENSON did rely on these false representations, and, as a result, was damaged.

58. At all times relevant to this Complaint, Defendants held BISHOP out to the public and members of the Church, including prospective sister missionaries, as a safe, honorable, trustworthy and respected leader of the Church. Defendant COP taught DENSON and other sister missionaries that a man called to be the President of the MTC, like BISHOP, would be a beacon of faith, morality and religious leadership. Furthermore, Defendants also held the Provo, Utah

MTC, and its premises, out as a safe, healthy, and trustworthy location and environment.

59. Defendants taught DENSON and other sister missionaries to trust, respect, and obey BISHOP and his position as President of the MTC.

60. Defendants had actual or constructive knowledge that BISHOP was a sexual predator, a sexual addict and had a history of red flag sexual improprieties toward young women under his authority, or over whom he worked through various church assignments.

61. Indeed, prior to the sexual assault at the MTC, BISHOP disclosed such red flag sexual improprieties to Elder Wells, a General Authority, and the highest ranking official in the Church over the South America area while BISHOP was serving as Mission President in Argentina. This knowledge constituted a material fact unknown to DENSON.

62. Plaintiff DENSON would not have entered into a trust relationship with Defendant COP to enter the MTC had she been aware of what Defendant COP and Defendant BISHOP were aware of. Indeed, such depravity by the man whom Defendant COP had placed in the highest position of power at the MTC and represented had superior faith and morality, was unthinkable to DENSON and other sister missionaries.

63. Defendants misrepresented to DENSON and other missionaries that BISHOP was safe and trustworthy. Defendants failed to disclose, and/or actively concealed the facts, including that BISHOP was a lifelong sexual predator with a sex addiction.

64. Defendants knew that the omissions were false representations or made the omissions with reckless disregard for the truth. By making these false representations and concealing the truth about BISHOP, Defendants knew, or had reason to know, that DENSON and others would be induced to trust Defendant COP and its leader, Defendant BISHOP, and thereby follow the long-standing doctrine, practice and tradition of the Church to serve missions and enter

the MTC in Provo, Utah.

65. Plaintiff DENSON reasonably relied on the omissions and engaged in a trust relationship with the Defendants and their agents. DENSON did not know, prior to her abuse, that BISHOP was a sexual predator and a sex addict, nor that Defendant COP's MTC was an untrustworthy and unsafe environment. These facts were concealed and hidden by Defendants. As a result, DENSON trusted BISHOP and went to his secret room inside the Church's MTC, where she was raped and sexually assaulted. DENSON was damaged as described in the paragraphs above.

66. Plaintiff DENSON did not learn of the fraud until December of 2017. Per Utah Code 78B-2-305(3), a fraud cause of action "does not accrue until the discovery by the aggrieved party of the facts constituting the fraud or mistake."

## VII.  FIFTH CAUSE OF ACTION: **FRAUDULENT CONCEALMENT or NONDISCLOSURE**

67. Plaintiff MCKENNA DENSON incorporates all paragraphs of this Complaint as if fully set forth herein.

68. Defendants committed fraudulent concealment or nondisclosure by knowing that BISHOP was a sexual predator with a sexual addiction and posed an unreasonable risk to young women before he was called to be MTC President. DENSON did not know of these important facts; rather, she was taught by Defendants that BISHOP was safe, honorable, and trustworthy; that a man called to be the President of the MTC, like BISHOP, would be a beacon of faith, morality and religious leadership. Defendants failed to disclose to DENSON that BISHOP was just the opposite - a sexual predator with a sexual addiction that posed an unreasonable risk of harm to DENSON and other sister missionaries in the Church's MTC.

69. As a result of Defendants' concealment or failure to disclose, DENSON trusted

BISHOP and went to his secret room inside the Church's MTC, where she was sexually assaulted and raped. She was damaged as described in the paragraphs above.

70. Plaintiff DENSON did not learn of the fraud until December of 2017. Per Utah Code 78B-2-305(3), a fraud cause of action "does not accrue until the discovery by the aggrieved party of the facts constituting the fraud or mistake."

### VIII. SIXTH CAUSE OF ACTION:
### AFFIRMATIVE INJUCTIVE RELIEF (and POLICY CHANGES)

71. Plaintiff MCKENNA DENSON incorporates all paragraphs of this Complaint as if fully set forth herein.

72. Plaintiff DENSON also prays for equitable relief from this Court for non-monetary redress and the protection of DENSON and other similarly situated members of the public, as follows: ***POLICY CHANGES:   Learn of a crime?  Don't call the help line.   CALL. THE. POLICE.***

73. That Defendant COP change its current corporate policies regarding reporting suspected sexual assault or abuse. Upon information and belief, the current policy is set forth in *2010 Handbook 2: Administering the Church, Section 13.6.18*, which provides that "[i]f a leader becomes aware of physical, sexual or emotional abuse of someone during a church activity, he or she should contact the bishop immediately."

74. Instructions for bishops are provided in *Handbook 1:17.3.2,* which provides in pertinent part, "[i]n the United States and Canada, the Church has established a help line to assist stake presidents and bishops in cases of abuse … When calling the help line, leaders will be able to consult with professional counselors and legal specialists who can help answer questions and formulate steps to take … Leaders can obtain information about local reporting requirements through the help line. Where reporting is required by law, the leader encourages the member to

secure qualified legal advice. To avoid implicating the Church in legal matters to which it is not a party, church leaders should avoid testifying in civil or criminal cases or other proceedings involving abuse." *Handbook 1, State Presidents and Bishops 2010, Section 17.3.2.*

75. On March 23, 2018 the Church again set forth its policy for church leaders who learn of sexual abuse. "We continue to urge our leaders to take reports of abuse very seriously. Leaders should call the Church's abuse helpline, which has been established to assure that victims are cared for and that abuse reporting laws are strictly obeyed."

*https://www.mormonnewsroom.org/article/statement-former-mission-president-alleged-abuse-joseph-l-bishop-march-2018*

76. Despite the specific instructions to its high-level leaders in *Handbook 1*, the Church constantly makes public statements that "[t]he Church has a zero-tolerance policy when it comes to abuse. … We cooperate with law enforcement to report and investigate abuse." *How the Church Approaches Abuse*, NEWSROOM (accessed on May 17, 2016). Public statements like this contradict the internal policies set forth in the Church's *Handbook 1*, and mislead members of the Church about what will happen after they report sexual abuse to their bishop or stake president. Indeed, this language may lead members to believe that their bishop or stake president will report sexual abuse to the police. *Handbook 1* does not, in fact, ever instruct these leaders to report abuse to police; rather, it directs church leaders to do the opposite.

77. Specifically, the Church's public claim that it "cooperate[s] with law enforcement to report and investigate abuse" is contradicted by the instructions in *Handbook 1:17.3.2,* which advises the Church leaders, "[t]o avoid implicating the Church in legal matters to which it is not a party, [by not] testifying in civil or criminal cases or other proceedings involving abuse." *Id.*

78. Because the current policies do not adequately protect sexual assault victims but

rather aim to protect Defendant COP, DENSON requests that these policies be changed and include the following:

    a.    Where a charge of sexual assault or abuse has been made against any agent, leader, or member of the Church, he or she shall be immediately removed from exposure to potential victims and all appropriate safeguards shall be made to keep him or her away from potential victims pending investigation.

    b.    Whenever any leader or member in the Church has reasonable suspicion of sexual assault, whether the assault happened during a "church activity" or not, this leader or member shall report the assault first to the police.

    c.    Every church member should be taught that if there is a reasonable belief that sexual abuse or sexual assault is occurring, such conduct should first be reported to the police before reporting it to a bishop or stake president.

    d.    Because this culture of secrecy has been such a long-standing policy of the Church, even victims of rape, sexual assault or sexual abuse have been taught and conditioned to keep such crimes within the Church. That the Church consider forming a committee to explore the best method for teaching victims, survivors, and members about the new policy and cultural change.

    e.    That the Church bring its publicized policies on assault and abuse into conformity with its *Handbooks* (and vice versa) eliminating any contradictions and doublespeak.

    f.    Instead of directing its leaders to not cooperate with civil or criminal authorities (if the Church could in any way be implicated) in situations involving assault or abuse, there shall be an affirmative statement in both *Handbook 1* and *Handbook 2* that

leaders and members shall cooperate with civil and criminal authorities in cases involving sexual assault and abuse; this includes truthfully testifying at depositions, hearings, trials and other proceedings, regardless of whether such testimony would implicate the Church.

g. That Defendant COP never seek to direct, pay, or hire any agent or employee or third party to retract, oppose, or challenge the constitutionality or legitimacy of any reform of a civil or criminal statute of limitations, mandatory abuse reporting clergy exemptions, or repeal of the clergy-penitent privilege or other laws which serve to shield sexual abusers from investigation, apprehension, prosecution, and conviction in Utah or similar legislation or law in any other state or jurisdiction.

**WHEREFORE,** Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. Non-economic damages as set forth above, in an amount to be determined by the jury at the time of trial;

2. Economic damages for loss of earnings and earning capacity, and medical expenses for psychological treatment, therapy, and counseling, in an amount to be determined by the jury at the time of trial;

3. For Plaintiff's reasonable attorney's fees, costs and disbursements to the extent permitted by law;

4. The equitable relief described above;

5. Statutory/civil penalties according to law; and

6. For any other relief this Court deems just and equitable.

*Attorney signature appears on the following page*

DATED this 4th day of April, 2018

        COHNE|KINGHORN
        *Attorneys for Plaintiff*


By:   */s/ Jeffrey R. Oritt*
      JEFFREY R. ORITT


And:   JAMES, VERNON & WEEKS, P.A.
       Craig K. Vernon
       *Pro Hac Vice Admission Pending*